UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:22-cr-259-TNM |
| BERNARD SIRR | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Bernard Sirr to ten months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.    INTRODUCTION

The defendant, Bernard Sirr, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Sirr, then a reactor engineer at the Rhode Island Nuclear Science Center, joined the rioters

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

who stormed the West Terrace of the Capitol. As the police line collapsed, officers retreated into a tunnel (LWT tunnel) that led to an entryway into the building. Rioters then invaded the LWT tunnel. At approximately 3:08 p.m., Sirr entered the LWT tunnel and made his way directly towards the front of the rioters, where he implored the officers to "join us," and to "be on the right side of history." Sirr was immediately behind rioter Patrick McCaughey[2] and Sirr and others engaged in a coordinated push against the line of Metropolitan Police Department (MPD) and United States Capitol Police (USCO) officers.

Sirr left the tunnel at approximately 3:14 p.m., but he did not leave the Capitol grounds. Instead, he remained outside the tunnel, stopping to film the violent assault on MPD Officer Fanone. At 4:14 p.m., Sirr made another attempt to enter the tunnel, pushing his way toward the front of the police line, and retreated only after engaging with officers for 12 minutes and having been sprayed with an anti-riot gas.

The government recommends that the Court sentence Sirr to ten months' incarceration, which is in the middle of the advisory Guidelines' range of 8-14 months. That is range calculated by both the parties in their plea agreement and by the Probation Office of this Court. A ten-month sentence reflects the gravity of Sirr's conduct and serves the sentencing purposes laid out in 18 U.S.C. 3553(a), while also giving due consideration to Sirr's post-arrest, pre-plea debrief with law enforcement officials, lack of any criminal history (not even an arrest or motor vehicle citation), and honorable military service.

---

[2] McCaughey was sentenced by this Court in Case No. 21-cr-40-1 (TNM) on April 14, 2023.   As noted in Sirr's Statement of Offense, Sirr was not acquainted with McCaughey.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 38, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

Although Sirr elected to plead guilty, this Court has presided over a trial involving similarly situated defendants and is well aware of the protracted and violent attack on the officers on the West Front and in the Lower West Terrace tunnel. As the Court has heard from the government in other sentencings, the violence inflicted by the mob against the police in the Lower West Terrace tunnel was both protracted and brutal. Officers were kicked, punched, beaten, tazed, and sprayed, but still they held the line. It is not an exaggeration to state the actions of these officers in thwarting the mob at the Lower West Terrace entrance likely saved the lives of others, including members of Congress.

### B.    Sirr's Role in the January 6, 2021 Attack on the Capitol

Sirr, who was a member of his local Proud Boys chapter on January 6, 2021, drove to Washington, D.C. with fellow Proud Boys from his home in North Kingston, Rhode Island. Sirr went to Washington to protest Congress' certification of the Electoral College.

*Approach to the Capitol*

Sirr attended the speeches at the Stop the Steal Rally at the Ellipse on the Washington, D.C. Mall. Following the speeches, Sirr linked up with a group of between six and eight Proud Boys

from the New England chapters and began to walk toward the Capitol. Open-source video captured Sirr walking with a large group of rioters in a single-line "stack" formation making their way towards the West Front of the building:



**Figure 1:** *Sirr approaching the West Front via the Pennsylvania walkway (available at https://www.youtube.com/watch?v=eA9JV7S45Cg&list=TLPQMTIxMDIwMjHkJxU6HzhszQ at 37:15)*

### Sirr's Conduct Inside the Tunnel

At approximately 3:08 p.m., Sirr entered the LWT tunnel and made his way towards the front of the police line:



**Figure 2:** *CCTV Footage at 3:08:12 p.m. with Sirr circled*

Moments later, Sirr was directly behind the rioters on the front lines against the police.

On open-source video with which this Court is very familiar, Sirr can be seen directly behind rioter

Patrick McCaughey:



**Figure 3:** *Screenshot of Government's Sentencing Exhibit 1 at 18:50, with Sirr and McCaughey*
*circled in yellow and Tristin Stevens circled in red*

Sirr joined the other rioters pushing against the police in an attempt to get into the building. A few seconds later, Sirr yelled to the officers, "join us!" and "pick the right side!" *See* Government's Sentencing Exhibit 1 at 19:20-19:31. Sirr then placed his hand on a police shield being held by a police officer and pushed against it:



**Figure 4:** *Government's Sentencing Exhibit 1 at 19:47*

Sirr again yelled at the officers to "get on the right side of history! Come on!" *See id.* at 19:50-19:53. Moments later, Sirr and dozens of rioters in the tunnel engaged in a coordinated "heave ho" series of thrusts against the police guarding the tunnel. *Id.* at 20:45-21:05. Sirr was among the front of the rioters facing off against the police during this push.   Shortly after the heave-ho, Sirr began to make his way away from the police line and towards the mouth of the tunnel.

***Sirr's Filming of the Assault on Officer Fanone and Second Attempt to Enter the Capitol***

Sirr left the LWT tunnel at 3:14 p.m., but he did not leave the grounds. Instead, Sirr took

6

up a position about 20 yards away from the tunnel entrance and watched the violence unfold. Approximately five minutes later, at 3:19 p.m., MPD Officer Michael Fanone was dragged from the tunnel by rioters, tazed, and beaten. Sirr was watched this horrific event, and a 360-degree open-source video captured both the violence inflicted against Officer Fanone and Sirr's reaction to it. As Officer Fanone was being beaten, and the crowd was in a frenzy, Sirr did not appear to yell anything or make any attempt to come to Officer Fanone's aid. Instead, he took out a cell phone and appeared to begin recording:





**Figures 5 and 6:** *Government Sentencing Exhibit 2 at 5:55*

Less than an hour later, at 4:14 p.m., Sirr made a second attempt to enter the tunnel and confront the police line. He went to the front of a group of rioters attempting to overtake the police guarding the entrance to the Capitol:

8



**Figure 7:** *Screenshot of Government's Sentencing Exhibit 3 at 0:19 (4:14:37 p.m.), with Sirr circled*

From 4:14 until 4:20 p.m., Sirr continued to push his way to the front of rioters facing off against the police line. At 4:16 p.m., Sirr was at the front of the line as the crowd of rioters continued to surge forward:



**Figure 8:** *Screenshot of Government's Sentencing Exhibit 4 at 1:48 (4:16:48 p.m.), with Sirr circled*

Sirr remained on the front of this line until 4:20 p.m., when the police line pushed the rioters out towards the mouth of the tunnel:



**Figure 9:** *Screenshot of Government's Sentencing Exhibit 4 at 5:43 (4:20:43 p.m.), with Sirr circled*

At 4:26 p.m., approximately 12 minutes after entering the tunnel a second time, Sirr was sprayed with a chemical irritant by the police and ejected from the tunnel. He was captured on both BWC and open-source video leaving the tunnel:



**Figure 10:** *available https://www.youtube.com/watch?v=iNFcdpZdkh0 at 1:15:32, with Sirr circled*

As he was being forcibly removed from the tunnel, Sirr could be heard on the BWC of MPD Officer A.W. telling officers that they were "crushing people" and asking other rioters to "push back a little:"



**Figure 11:** *Screenshot of Officer A.W.'s BWC, Government's Sentencing Exhibit 5, at 0:00-0:10, with Sirr circled*

### *Sirr's Statements*

**A.     Sirr's Social Media Posts Leading up to and After January 6**

In the leadup to January 6, Sirr maintained a Twitter account under the handle "@l_lycurgus," where he posted and re-tweeted increasingly violent and threatening rhetoric. On December 10, 2020, Sirr posted that "the noose is tightening around the traitors necks" and alluded to violent alternatives if the Supreme Court did not intervene in what he believed to be a fraudulent election:



**Figure 12:** *Sirr's Twitter Post on December 10, 2020*

Four days later, Sirr Tweeted directly to the former president, telling him that "Patriots are ready to FIGHT against this election:"



**Figure 13:** *Sirr's Twitter Post on December 14, 2020*

On December 19, 2020, the former president sent out a Tweet calling for a "wild" protest in Washington, D.C., on January 6, 2021. The next day, Sirr declared that he would be attending the Stop the Steal rally and that it would be "epic." Sirr followed up on December 21, 2020, by responding to the former president and again alluding to the possibility of violence:



**Figure 14:** *Sirr's Twitter Post on December 20, 2020*



**Figure 15 and 16:** *Sirr's Twitter Post on December 21, 2020*

Sirr re-tweeted political commentary of others in the days leading up to January 6. On the evening of January 6, following a post from the former president that resulted in him being suspended from Twitter, Sirr responded to the Tweet by thanking the former president:



**Figure 17:** *Sirr's Twitter Post on January 6, 2021*

**B.      Sirr's Interviews with FBI Agents**

Sirr was initially interviewed by FBI agents following his arrest on June 29, 2022. During that interview, Sirr waived his *Miranda* rights and agreed to speak with agents without counsel. Sirr acknowledged that he was in Washington, D.C. on January 6, 2021, and that things got out of hand, but denied committing any violent acts. He described his reason for going to the Stop the Steal rally as a "patriotic thing" and that he had driven down to D.C. with some individuals that he met at a bar in Rhode Island. Five minutes into the interview, Sirr invoked his right to an attorney and the interview was terminated.

A few months later, in September 2022, Sirr agreed to a proffer with the government prior to entering a plea. Over the course of nearly three hours, Sirr provided the government with information on how he got to D.C., why he went there, and what he did. Sirr described being unhappy with the state of affairs in the country and wanted to attend the rally in support of the former president. He stated that he was concerned about violence given the civil unrest in the summer of 2020 and did not want to attend the rally alone. Sirr spoke with a friend of his from their military service, and the friend sent Sirr an application for the Proud Boys chapter in Rhode Island. Sirr stated that he applied to become a member of the Proud Boys because he wanted to attend the rally with a group.

15

Sirr stated that he met with Rhode Island chapter of the Proud Boys approximately one month before the rally, in December 2020. Sirr attended multiple Proud Boys meetings and described the leadership and structure of the organization. Sirr stated that approximately eight or nine members decided to travel to Washington for the January 6 rally, and that he had been given specific instructions not to bring any weapons or any Proud Boys gear identifying membership.

Sirr described driving to Washington, D.C., from Rhode Island. He packed a first aid kit as well as hand-held radios that he distributed to the group. Sirr detailed the methods the group used to communicate, and that the Proud Boys used different levels of access based on a person's position in the organization. Sirr stated that, following January 6, he was moved to the "second level."

Despite his online rhetoric, Sirr told the government that he never intended on going to the Capitol, but that he did so after hearing the former president's speech. After the speech, Sirr linked up with other Proud Boys from the New England chapters and walked to the Capitol.

Sirr also minimized his involvement in the violence at the Capitol. Sirr told the agents he did not recall how he ended up in the Lower West Terrace tunnel. He continued to insist that he did not participate in violence that day, despite being shown a video of him in the tunnel and identifying himself. Sirr denied committing violence and maintained that he could have inflicted harm if he had chosen to. He admitted witnessing others commit violence and recalled seeing a "biker guy" beat a police officer with a pole.

Sirr stated that the reason he went towards the tunnel a second time was because he observed a couple with a 14-year-old son, and he was trying to ensure their safety. Sirr stated that

the couple and their son turned back at the top of the stairs, but that Sirr stayed. After being shown another video of himself at that time, Sirr was unable to point out the couple with the child and why they were not present as he had described. The government has never found evidence corroborating Sirr's stated reason for reappearing at the mouth of the tunnel. Rather than being fully cooperative, it appears, at minimum, that Sirr has not been fully truthful about this incident.

Sirr admitted that, between his first and second attempts to enter the LWT tunnel, he remained in the area around the Capitol steps. When asked about his intentions when he entered the Capitol, he stated that he did not intend to interrupt Congress' certification of the election, but repeatedly denied knowing what his intentions were. Sirr stated that he disaffiliated from the Proud Boys following the events of January 6, 2021.

## III.      THE CHARGES AND PLEA AGREEMENT

On July 27, 2022, a federal grand jury returned an indictment charging Bernard Sirr with Six counts, including Count One, Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3). On, January 27, 2023, Sirr was convicted of that offense based on a guilty plea entered pursuant to a plea agreement.

## IV.      STATUTORY PENALTIES

Sentencing now faces sentencing on Count One, Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Sirr faces up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The Guidelines calculations in the Final PSR (ECF No. 49) mirror those to which the parties stipulated in the plea agreement and are correct. The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 63. Accordingly, based on a total offense level of 11 and a criminal history category I, Sirr's guideline imprisonment range is 8 to 14 months' imprisonment.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its

very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual who entered the Capitol grounds and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol grounds, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

This Court has already sentenced many January 6 defendants, including defendants who committed crimes in and around the LWT tunnel in close proximity to Sirr. This Court, in determining a fair and just sentence, should look to several critical factors to hold Sirr accountable for his repeated and violent conduct on January 6, 2021.

Sirr was on the Capitol grounds for at least 70 minutes. He went into the LWT tunnel twice and was at the forefront of the mob attempting to overtake the police. During his first foray, he pushed against an officer's police shield and participated in a heave-ho series of thrusts against those officers. He then left tunnel and continued to watch the violence, stopping to film as Officer Fanone was dragged from the tunnel and violently assaulted. Less than an hour later, Sirr returned to the fight, and only retreated after being sprayed and forcibly removed. The nature and circumstances of Sirr's offense were of the utmost seriousness, and fully support the government's recommended sentence of ten months' incarceration.

**B.  The History and Characteristics of the Defendant**

Sirr has no prior arrests or convictions. He served honorably in the military, and has maintained steady employment all his life, most recently as a reactor engineer at the Rhode Island Nuclear Science center and, since his arrest, as a master electrician.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Sirr's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Although Sirr has now expressed remorse and contrition, his social media posts both before and immediately after January 6 were those of a man prepared for battle. Importantly, Sirr did not

---

[3]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

just enter the tunnel, participate in a collective push against law enforcement, and then leave. He stayed close to the fray, filmed a horrific assault against a law enforcement officer, and, after that event, decided to attempt entry through the LWT tunnel a second time. He was only turned away after being overwhelmed and sprayed by the officers guarding that tunnel.

Later that evening, his social media response to the former president was not one of contrition, but defiance. Sirr first expression of any remorse was after he was arrested, fired from his job, and faced with the possibility of imprisonment. A sufficient sentence of incarceration is necessary to provide specific deterrence to Sirr that participation in a riot, and specifically his conduct towards law enforcement, can never be justified nor repeated.

### E.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

21

**F.      Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing

philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

There are many January 6 cases pending that are similar to Sirr's, where individuals inside the LWT tunnel engaged in a collective "heave ho" against law enforcement but did not directly assault police officers. Sirr's case, however, is the first to progress sentencing, and so this case is unique in the January 6 context. The Court is quite familiar with *United States v. McCaughey*, 21-cr-40, where this Court sentenced the defendant to 90 months' incarceration for McCaughey's assaultive conduct in the LWT tunnel and use of a deadly or dangerous weapon. Of course, McCaughey went to trial, was convicted of more serious crimes, and his conduct directly resulted in injury to officers. As this Court noted at sentencing, McCaughey appears to be the most egregious of his co-defendants to go to trial. Sirr was next to McCaughey in the tunnel as Sirr put his hand on a police shield, but Sirr's overall conduct is far less serious.

The single most similar case to Sirr is that of his co-defendant, Luke Lints, who is scheduled to be sentenced three days after Sirr on May 26. Lints and Sirr entered the LWT tunnel at approximately the same time and were both at the front of the line of rioters during the first collective "heave ho" against the police. Lints also utilized stolen police equipment inside the tunnel and during the pendency of his case has failed to fully appreciate the nature and harm of his conduct. However, Lints also never attempted to reenter the tunnel after seeing the violence, which this Court should find to be an aggravating factor against Sirr.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[6] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Sirr must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Sirr played in the riot on January 6.[7] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,734,783.14" in damages, a figure based on loss estimates supplied by the Architect of the

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Capitol in April 2022. *Id.* Sirr's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 44.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of ten months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:   Stephen J. Rancourt
Assistant United States Attorney, Detailee
Texas Bar No, 24079181
601 D Street, N.W.
Washington, D.C. 20530
(806) 472-7398
stephen.rancourt@usdoj.gov